IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 22 CR 581 |
| -v- | Honorable Judge Manish S. Shah |
| JAMES P. LOFTON, | |
| Defendant. | |

### JAMES LOFTON'S SENTENCING POSITION PAPER AND OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Defendant, JAMES LOFTON, through his attorney, BLAIRE C. DALTON, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3553(a), as well as the Sixth Amendment to the Constitution of the United States and the Supreme Court's opinion in *Gall v. United States*, 552 U.S. 38 (2007), respectfully submits the following sentencing memorandum and requests that this Honorable Court impose a sentence of time served. Such a sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing as articulated in 18 U.S.C. § 3553(a).

I.  INTRODUCTION AND SENTENCING REQUEST

What brings James before the Court for sentencing is not reflective of a violent man or a hardened criminal, but rather, the actions of a man who has suffered from schizophrenia his entire life and was experiencing a severe episode at the time the instant crime was committed. Indeed, at the outset of this case, it was

evident to the Court that James was suffering from a mental illness and may not be competent to proceed with his initial appearance, arraignment, or detention hearing. A forensic evaluation was conducted and confirmed that James was suffering from a mental disease, namely – schizoaffective disorder, depressive type - rendering him mentally incompetent to proceed in his case.

On February 9, 2023, James was ordered committed to the custody of the Attorney General for restoration. James spent the next eight months waiting to be transferred to FMC Butner to commence his restoration to competency. During that time, James remained in pre-hospitalization custody, languishing without the appropriate mental healthcare. In late October 2023, James was finally transferred to FMC Butner for restoration. After about four months of hospitalization and treatment, James was deemed competent to stand trial. On May 1, 2024, James was returned to the custody of the Metropolitan Correctional Center ("MCC") Chicago and finally arraigned.

Due to the conditions at the MCC-Chicago, in September 2024, James sought and was granted release to Bryn Mawr Care, a specialized mental health rehabilitation facility (SMHRF). For almost a year now, James has remained compliant with his conditions of release, continues to maintain his prescribed psychiatric regimen, is actively participating in individual and group mental health and addiction therapy sessions, and is being assessed to live independently with the aid of Trilogy Behavioral Healthcare.

While it is difficult for James to recall the events that led to his arrest, as he

was suffering a psychiatric break, he is ashamed of his actions. Over the last few years, it has become apparent that, with the right medication and care, James can be trusted to return to society. In consideration of the circumstances surrounding the 23 months that James has already served in his case, the appropriate and fair sentence is a sentence of time served.

## II. CORRECTIONS TO THE PSR

In calculating the advisory Guidelines range in this case, the Presentence Investigation Report ("PSR") concludes, and the parties agree, James' total offense level is 21. This accounts for a base offense level of 24 and a three-level reduction for acceptance of responsibility. The parties further agree that with six points and a criminal history category of III, the applicable Sentencing Guidelines range is 46-57 months' imprisonment.

**Corrections to the PSR**

James requests that the following corrections be made to the PSR:

¶¶3, 8: While James has readily admitted that he approached the FBI guard station on October 7, 2022, he has no recollection of threatening Victim A or stating, "everyone is going to die." As such, James requests that these paragraphs be corrected to reflect the language in the factual basis as written in his plea agreement, namely, that "According to Victim A" James made these threats.

¶6: James seeks to correct this paragraph to reflect that the reason he "failed to power his ankle monitor" was because he had put the battery in backwards. Similarly, he would like to include the language that because of this mistake, it

3

"made it appear" that his whereabouts were unknown.

¶113: James seeks to correct this paragraph. He completed his GED at Madden Hospital, not while he was detained in the Cook County Jail.

### III. A SENTENCE OF TIME SERVED WITH THREE YEARS OF SUPERVISED RELEASE SATISFIES THE GOALS OF SENTENCING UNDER § 3553(a)

After determining the appropriate guideline calculation, and determining if any departures are warranted, courts should then consider the factors found in § 3553(a) to determine whether to impose a guideline or non-guideline sentence. *See United States v. Solis-Bermudez*, 501 F.3d, 882, 886 (8th Cir. 2007). These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to promote respect for the law and protect the public, the sentencing range, and the need to avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a). Factors that have already been taken into account in calculating the advisory guidelines, and those that historically were not to be considered as a basis for departures, are now part of the analysis and can form the basis of a variance. *Id.*

The long history of the belief of sentencing is that courts should consider the individual as a "whole," and not just the act that was done. *Pepper v. United States*, 562 U.S. 476, 487–88 (2011). In *Pepper*, the Supreme Court articulated this long-held feeling of the purpose of sentencing:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

4

> Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime. Consistent with this principle, we have observed that both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. In particular, we have emphasized that highly relevant—if not essential—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant."

*Id.* (citations and internal quotation marks omitted).

Thus, many factors related either to the case or to an individual's personal history may play into a rationale to justify a variance. The Supreme Court has re-emphasized that "[n]o *limitation* . . . be placed on the information concerning the background, character, and conduct" of a defendant that a district court may "receive and consider for the purpose of imposing an appropriate sentence." *Pepper*, 562 U.S. at 476.

An examination of James' case against the §3553(a) factors confirms that a sentence of time served with three years of supervised release is sufficient, but not greater than necessary to meet the goals of sentencing.

### A. NATURE OF THE OFFENSE

The offense is entirely a product of James' significant mental health issues. In the weeks leading up to the offense for which he finds himself before this Court, James was attempting to obtain psychological assistance. When he initially approached the FBI guard station in October 2022, regardless of what he recalls

5

saying to the attendant, he was begging for medication and to be transferred to a hospital. On October 12, 2022, James was involuntary admitted to Mercy Aurora Medical Center on an emergency basis. He was discharged on October 20, 2022. See Exhibit A, DOJ Forensic Evaluation, dated January 17, 2023[1]. Then, on November 4, 2022, James returned to Mercy Hospital begging to be admitted and provided psychiatric medication. Mercy Hospital conducted a psychological evaluation and immediately discharged him. When James refused to leave, law enforcement was notified to remove him from the premises. See Ex. B, p. 4, Butner Forensic Evaluation, dated February 21, 2024. Absent the necessary psychotropic medication, James was not in control of his thoughts or his mind. He proceeded to engage in the conduct that resulted in his arrest in this case.

Now that James has been restored to competency and compliant with his medication regimen for well over a year, he understands the seriousness of his actions and accepts responsibility for them.

**B.    JAMES' HISTORY AND CHARACTERISTICS**

James' life has been inundated with psychological battles that only he can explain. James never experienced what it was like to live in a stable household with loving, supportive parents. His father abandoned the family when James was only five years old. His mother was constantly working to try and support her seven

---

[1] The parties and the Court have previously been provided copies of all forensic evaluations conducted in this case. Out of an abundance of caution and for ease of reference, additional copies have been submitted to the Court via email to protect James's privacy.

children – James' half-siblings. They lived in the infamous Robert Taylor Homes riddled with gang violence. As a little boy, James was verbally and physically abused by gang members every time he ventured outside. In an effort to keep him safe, James spent much of his childhood indoors in front of the television. Without the constant support of a loving parent, no one knew of the mental battle James was silently enduring.

Essentially, James has been at war with his mind since he was only 12 years old. In some of the most impressionable years of his life, James could only think of hurting himself – his earliest attempt of taking his own life involved cutting his legs with a knife. James went another seven years without a diagnosis or any psychological intervention. During that time, when he was only 16 years old, his mother abandoned him and moved to Mississippi while he was his siblings were left to fend for themselves in public housing.

At nineteen, James began hearing voices telling him to harm himself and began experiencing extreme paranoia. Thankfully, he had the wherewithal to check himself into an emergency room where he was admitted on a psychiatric hold. That was the first time he was diagnosed with and began receiving treatment for schizophrenia and bipolar disorder. From then on, he has endured a lifetime of homicidal and suicidal ideations. James has attempted to take his own life, typically via prescription medications, at least ten times. He has been in and out of psychiatric hospitals at least twenty different times. James is now proficient in

understanding when he is in the midst of a psychiatric emergency and will voluntarily seek emergent care.

It is no surprise that James has struggled with the criminal justice system much of his life. Indeed, his criminal history problems intersect with when he was first diagnosed with schizophrenia. While he takes full responsibility for his past, some of those choices can most certainly be attributed to his psychological diagnoses, and the failure of the criminal justice system to focus on his mental health and rehabilitation over punishment.

As evidenced by his demeanor and progress since entering FMC Butner in October 2023 – under the appropriate care, with the proper medication regimen, James can remain in society and even thrive. The strides James has made since his release in this case are nothing short of remarkable. James has been on pre-trial release since September 2024 and during that time, his conduct has been nothing short of exemplary. He has been under the constant psychiatric watch of Bryn Mawr Care, he has remained complaint with his medications, he participates in group and individual counseling for mental health and addiction treatment and is even being assessed to live on his own. Since his release, he has remained free of any allegations of criminal conduct or threats of violence.

C. **REMORSE AND REHABILITATION**

Statistics show that straight prison sentences do not promote rehabilitation. Moreover, the cost of incarceration is seven times higher than the cost of

8

supervision by probation officers.[2] There can be little doubt that there is a cost-benefit value associated with rehabilitation programs aimed at lowering recidivism rates.[3]

Indeed, one of the goals of sentencing is rehabilitation, *see, e.g., United States v. Grayson*, 438 U.S. 41, 45-48, 98 S.Ct. 2610, 2613-14, 57 L.Ed.2d 582 (1978); *Williams v. New York*, 337 U.S. 241, 247-48, 69 S.Ct. 1079, 1083-84, 93 L.Ed. 1337 (1949), and a defendant's admission of responsibility or expression of contrition "is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence," *Smith v. Wainwright*, 664 F.2d 1194, 1196 (11th Cir.1981). Admission of guilt thus may properly be taken into account in determining what sentence is needed to achieve rehabilitation. *See Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

Section 3553(a)(2)(D) requires the judge to consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Today, there is substantial evidence that prison, by disrupting employment, reducing prospects of future employment, weakening family ties, and exposing less serious offenders to more serious offenders, leads to increased

---

[2] *See* Mathew Rowland, Deputy Assistant Director of Administrative Services letter of May 6, 2008 at www.nynd-fpd.org/sentencing/cost%20of%20incarceration%20and%20supervision%202007.pdf
[3] *See* www.ussc.gov/publicat/Recidivism_General.pdf. at 15-16.

recidivism, and that community treatment programs are more effective in reducing recidivism than prison treatment programs. See Lynne M. Vieraitis, Tomaslav V. Kovandzic, Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Public Policy 589 (2007). If addiction creates a propensity to commit crime, rehabilitation goes a long way in preventing recidivism. In fact, statistics suggest that the rate of recidivism is less for offenders who receive treatment while in prison or jail, and still less for those treated outside of a prison setting. *See* Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders*, 53 Hastings L.J. 1217, 1220 (2002); *see also* Doug McVay, Vincent Schiraldi, & Jason Ziedenberg, *Treatment or Incarceration: National and State Findings on the Efficacy of Cost Savings of Treatment Versus Imprisonment* (March 2004), Justice Policy Institute Policy Report ("Treatment is a much less expensive option than incarceration for handling substance abusing offenders … Dollar for dollar, treatment reduces the societal costs of substance abuse more effectively than incarceration does."). *Id.* at 5-6.

      Once restored to competency, James has taken responsibility for his actions in this offense. More importantly, his potential for rehabilitation is evidenced by his consistent participation in treatment and compliance with his medications. To impose a sentence to any additional incarceration, would undoubtedly be, as probation attests, "counterproductive to his progress and overall future success and greater than necessary to achieve the goals of sentencing." See Sentencing Recommendation, p. 3.

James' rehabilitation would be best served by his continued mental health and substance abuse counseling and care at Bryn Mawr. As already demonstrated early on in this case, unless James is receiving specific psychological treatment only available at select BOP facilities, James, the staff, and the residents at "ill-equipped facilities" – will suffer.

**D. JUST PUNISHMENT**

Section 3553(a)(2)(A) requires the judge to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A sentence that is excessive in light of the seriousness of the offense promotes disrespect for law and provides unjust punishment.

Although James' conduct calls for punishment, the circumstances he endured while housed at MCC-Chicago from November 2022 through October 2023 (when he was transferred to FMC Butner) should be taken into consideration. During that time, he was housed in the segregated housing unit (SHU)– which is a nice way of saying solitary confinement. The staff at MCC-Chicago were unapt to handle a resident who was suffering from severe schizophrenic episodes. Instead, they isolated him and punished him by writing him up on several incident reports – all of which stemmed from psychological episodes. He complained of concerns that cell mates were trying to kill him, he complained that someone had removed his organs, he complained when he felt suicidal. The response was to write him up, continue his isolation, place him in wrist and ankle restraints, and even use oleoresin capsicum

11

(OC) pepper spray against him. See Exhibit B, pgs. 4-5.

By the time James arrived at FMC Butner, his intake examination noted that, in addition to his mental health issues, he was suffering from hypertension and right eye blindness. Five months earlier, at the MCC, James reported he was experiencing extreme pain in his right eye and that it was bleeding. Nothing was done. At FMC Butner, the ophthalmologist indicated that James had a mature cataract, posterior synechia, and iris atrophy in the right eye, consistent with traumatic or inflammatory etiology. Extraction was recommended but not completed. See Ex. B, p. 6.

Even after the abysmal conditions James experienced at MCC-Chicago, he spent nearly another year in custody between FMC Butner, and then back to the MCC-Chicago. Taken together, James has been punished enough. It is time to focus on his rehabilitation and continue the success he has had over the last year.

IV. **OBJECTIONS TO CONDITIONS OF SUPERVISED RELEASE**

    a. **Discretionary Conditions**

James objects to the following conditions:

**Discretionary Condition #16** – As the Seventh Circuit recently noted, "In a number of cases, we have disapproved of such conditions [as that in discretionary condition 16] if they failed to qualify when or where a probation officer may impinge on his supervisee's liberty." *United States v. Smith*, 2018 U.S. App. LEXIS 29049, at *7. Specifically, permitting a probation officer to visit James at his place of employment (which is unlikely due to his inability to work), or his community

12

service location (unlikely for the same reasons as noted below).

    b.    **Special Conditions**

**Special Condition #3** – James is on social security disability income. He is unable to obtain or maintain employment and similarly mentally unable to perform community service.

**Special Condition #10** – James respectfully requests that his financial obligations should be withheld from his income at a rate of 5% instead of 10%.

## CONCLUSION

A sentence other than imprisonment is appropriate in this case and as Congress intended.[4] In fashioning a sentence that is sufficient, but not greater than necessary, James Lofton respectfully requests the sentence as recommended by Probation – a sentence of time served with three years of supervised release. Such a sentence would allow James to continue receiving the care he has become accustomed to at Bryn Mawr - a facility that has focused on both his mental health and addiction treatment with individualized attention. He is flourishing and has done so well that he has been assessed for independent living conditions. It would be against the purposes of sentencing to disrupt his success at this juncture.

---

[4] The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury. 28 U.S.C. §994(j).

Respectfully submitted,

/s/   Blaire C. Dalton
Attorney #6305696
DALTON LAW, LLC
53 W. Jackson Blvd., Ste. 1523
Chicago, IL 60604
P: (847) 373-4750
F: (312) 427-1788
Blairec.dalton@gmail.com

14